**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ZSOCH DUNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17-cv-00656 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| P.O. MANICKI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

After pulling over Plaintiff Zsoch Dunn for a traffic violation in LaSalle, Illinois in the early morning hours of February 2, 2016, police officers arrested Dunn for aggravated battery and fleeing and eluding. Dunn subsequently filed this civil rights lawsuit, bringing claims under 42 U.S.C. § 1983 and Illinois state law against Defendants Sergeant Mark A. Manicki, Officer Raymond Gatza, Officer Aaron J. Buffo, Officer Timothy J. Margis, Officer Pete J. Sines, Deputy Kye Denault, various unknown officers, the City of LaSalle ("City"), the County of LaSalle ("County"), and Dr. David Kelton. Now before the Court are two motions for summary judgment under Federal Rule of Civil Procedure 56—the first filed by Defendants Denault and the County (Dkt. No. 155), and the second by Defendants Manicki, Gatza, Buffo, Margis, Sines, and the City (Dkt. No. 160). For the reasons provided below, Defendants' motions for summary judgment are both granted.

## BACKGROUND

Dunn has brought eight claims against law enforcement officers alleging various violations of his constitutional rights, including use of excessive force, false arrest, wrongful deprivation of property, and conspiracy to deprive him of adequate medical care. (*See* Am. Compl., Dkt. No. 48.)

All of Dunn's claims arise out of his February 2016 traffic stop in LaSalle, his altercation with police during and after his resulting arrest, and his medical treatment later that night at Illinois Valley Hospital.

## I.    Procedural History

Because several procedural irregularities in Dunn's case provide important context for the present ruling, the Court will recount the procedural history before turning to the facts of the case.

Dunn initially filed this case as a *pro se* litigant on January 27, 2017. (*See* Compl., Dkt. No. 1; Dkt. No. 3.) The judge that originally oversaw the case recruited a pro bono attorney to represent Dunn in May 2018.[1] (*See* May 8, 2017 Min. Entry, Dkt. No. 17.) With the assistance of counsel, Dunn filed the amended complaint that remains the operative complaint in this case. (*See* Am. Compl.)

In August 2017, Defendant Kelton (a physician at Illinois Valley Hospital) moved to dismiss the two counts against him for failure to provide medical attention and conspiracy to deprive Dunn of medical attention pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Dkt. No. 51.) Dunn's first attorney briefed that motion. (*See* Pl.'s Resp. in Opp'n to Def. Kelton's Mot., Dkt. No. 54.) Then, in September 2018, Dunn's recruited counsel filed a motion for leave to withdraw from his representation, citing a substantial disagreement with Dunn. (*See* Dkt. No. 88.) This Court granted the motion (*see* Oct. 23, 2018 Min. Entry, Dkt. No. 94) and recruited new counsel to assist Dunn (*see* Nov. 14, 2018 Min. Entry, Dkt. No. 95). A short time later, the Court granted Dr. Kelton's motion to dismiss, finding that Dunn had failed to allege that Kelton was a state actor (as required for a § 1983 claim) and that Dunn had failed to state a conspiracy claim against him. (*See* Feb. 26, 2019 Order-Statement, Dkt. No. 106.) The Court granted Dunn leave to file a second amended complaint to attempt to remedy those pleading deficiencies by March 12,

---

[1] Dunn's case was reassigned to this Court in October 2017. (*See* Dkt. No. 56.)

2019. (*Id.*) Though Dunn was represented by his second pro bono attorney at that time, he submitted a purported amended complaint *pro se*, postmarked March 22, 2019, handwritten, one-page long, and containing only Counts IV and VI of his claims. (*See* Am. Counts, Dkt. No. 113.)

Dunn's filing was improper for a number of reasons. First, he submitted it *pro se* rather than through his attorneys. *See Agrawal v. Pallmeyer*, No. 07-cv-4283, 2008 WL 450818, at *4 (N.D. Ill. Feb. 15, 2008) ("It is a well established principle of law that courts do not accept filings directly from a party who is represented by counsel; all filings must come from the counsel representing that party."). Next, he mailed it ten days after the deadline and failed to move for an extension of time or for leave to file late. Third, Dunn could not amend his complaint piecemeal by submitting only Counts IV and VI because an amended complaint supersedes the original entirely and renders it void. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004). Dunn also failed to limit his amendments to the claims against Dr. Kelton as the Court directed. He apparently sought to add new parties as defendants. (*See* Am. Counts (referring to "Carmen Head Nurse," "Rahm – Emanuel," CPD, and the City of Chicago).) Finally, even if Dunn's filing had been procedurally proper, it would not have cured the deficiencies of Dunn's first amended complaint. For all of these reasons, the amended pleading as to Dr. Kelton was not accepted by the Court and has never been operative. The Court thus clarifies here that Dr. Kelton is dismissed from the case with prejudice pursuant to Rule 12(b)(6).

In April 2019, Dunn's second recruited attorney moved for leave to withdraw, citing several serious problems that arose during his representation, including Dunn attempting to make filings on his own and sending communications that contained threats. (*See* Dkt. Nos. 109, 111.) The Court granted counsel's request to withdraw. (*See* Apr. 9, 2019 Min. Entry, Dkt. No. 115.) Because of Dunn's repeated difficulties with recruited counsel, the Court concluded that it was

extremely unlikely he would be able to work cooperatively with any attorney. For that reason and after considering that "[t]he valuable help of volunteer lawyers is a limited resource," the Court decided against recruiting a third *pro bono* attorney on his behalf. *Cartwright v. Silver Cross Hosp.*, 962 F.3d 933, 936–37 (7th Cir. 2020) (internal quotation marks omitted) (calling the district court's use of its discretion to recruit numerous attorneys to represent a "willfully uncooperative litigant" "a serious mistake"). Nonetheless, the Court explained to Dunn that it would reconsider recruiting counsel if his case proceeded to a jury trial. (*See* Apr. 24, 2019 Min. Entry, Dkt. No. 116.) Dunn has represented himself in this case *pro se* since April 2019.

Defendants filed their motions for summary judgment on March 27, 2020 (*see* Dkt. No. 155) and April 20, 2020 (*see* Dkt. No. 160), at the beginning of the COVID-19 pandemic. The Court's First and Second Amended General Orders addressing the pandemic extended the briefing schedule on Defendants' motions. (*See* Dkt. Nos. 154, 159.) In light of Dunn's *pro se* status and to avoid any confusion, on April 21, 2020, this Court issued a case-specific order clarifying the briefing schedule, giving Dunn another two months (until June 26, 2020) to file his response to both motions, and ordering Defendants to reply by July 17, 2020. (*See* Apr. 21, 2020 Min. Entry, Dkt. No. 166.) On April 24, 2020, the Third Amended General Order subsequently extended those deadlines by another twenty-eight days to July 24, 2020 and August 14, 2020, respectively. (Dkt. No. 167.)

On September 29, 2020, the Court issued an order noting that two months had passed since Dunn's extended deadline, and yet he still had not responded to Defendants' motions. (*See* Sept. 29, 2020 Order, Dkt. No. 173.) The Court *sua sponte* afforded Dunn "one last opportunity to submit his briefing" three weeks later—*i.e.*, by October 20, 2020—and provided specific filing instructions concerning the courthouse's special COVID-19 procedures for *pro se* filers. (*Id.*) On

his extended final deadline of October 20, instead of filing his response, Dunn filed a four-page motion for another one-week extension and a twenty-seven-page motion for a jury trial and for sanctions. (Dkt. Nos. 175, 176.) Because Dunn had already received numerous extensions, his lengthy motions demonstrated that he had sufficient time and resources to submit a response by October 20, and he failed to offer a clear reason why an additional week would enable him to submit an improved response, the Court denied his motion for additional time. (*See* Dec. 21, 2020 Order, Dkt. No. 180.) However, the Court explained that to the extent Dunn's recent filings made legal arguments opposing Defendants' summary judgment motions, the Court would consider those arguments in its ruling. (*Id.*) Otherwise, the Court confirmed that it considered Defendants' motions as fully briefed and ready for ruling. (*Id.*) The Court also denied Dunn's motion for a jury trial as unnecessary and his motion for sanctions as unintelligible. (*Id.*) Finally, the Court's December 21 Order noted that Dunn had failed to respond to Defendants' statements of material facts pursuant to Local Rule 56.1. (*Id.*)

Local Rule 56.1 requires the party moving for summary judgment to submit a statement of material facts that it contends are undisputed and entitle it to summary judgment. L.R. 56.1(a)(3) (N.D. Ill.). The statement of facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a) (N.D. Ill.). Then, the party opposing summary judgment must file "a concise response to the movant's statement" of facts. L.R. 56.1(b)(3) (N.D. Ill.). The response should respond to each numbered paragraph in the moving party's statement and where the opposing party disputes a fact, it must include specific references to the affidavits, parts of the record, or other supporting materials relied on to controvert the fact. *Id.*

Dunn did not file a clear response to Defendants' statements of material facts or set forth his own statement. The Seventh Circuit has explained that the district court does not have the obligation to scour the record for facts that might support a party's position when he fails to comply with the local summary judgment rules. *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016). The Court finds that Dunn has waived his right to dispute the facts Defendants present. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–24 (7th Cir. 1994); *see also Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure."). Therefore, as long as Defendants' facts are adequately supported by the record, the Court views those facts as admitted for purposes of this Opinion. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

One final procedural note bears mentioning. On February 23, 2021, while the Court was preparing its ruling on Defendants' summary judgment motions, Dunn attempted to file a number of new documents over email using the *pro se* filing procedures, including: (1) a notice of motion (PDF format); (2) a motion seeking declaratory relief, a trial date, denial of summary judgment, and adverse inference jury instructions (PDF format); (3) fifteen photographs (JPG and PNG formats); and (4) a motion for declaratory judgment, sanctions, and trial (Word format). The photographs Dunn attached appear to be stills from video surveillance and pictures of court filings, none of which add anything new or substantive into evidence. Dunn's written filings generally repeat the allegations of his amended complaint and assert that Defendants continue to destroy evidence. The filings also refer to issues that are not properly raised in this case, including potential claims against nonparties and events outside the scope of this litigation. Because Dunn is a *pro se* litigant and his pleadings should be construed liberally, *see Dale v. Poston*, 548 F.3d 563,

6

568 (7th Cir. 2008), the Court accepted and docketed the documents (*see* Dkt. No. 182) and considered them for purposes of the present Opinion.

## II.      Undisputed Facts of Dunn's Arrest and Detention

In ruling on Defendants' motions for summary judgment, the Court recounts the facts in the light most favorable to Dunn as the nonmoving party. *Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016).

Around midnight on the evening of February 1, 2016 or early morning of February 2, 2016, City police officers Sergeant Manicki and Officer Gatza were on patrol on Interstate 80 in LaSalle, Illinois when they saw Dunn's car on the road. (Defs. Manicki, Gatza, Buffo, Margis, Sines, and City's Statement of Material Facts ("DSOMF-A") ¶¶ 2, 9–10, Dkt. No. 162.) Dunn was driving sixty-one miles per hour in a seventy-mile per hour area, which Manicki found suspiciously slow. (*Id.* ¶¶ 10–11.) Defendants have offered into evidence a number of video exhibits (provided to the Court on USB drives), including dashboard camera footage from Manicki and Gatza's patrol car that night. (*See id.*, Ex. 4, Dash Cam 1, Dkt. No. 162-4.) The beginning of the first video displays only the road and cars viewed through the front windshield. (*Id.*) But on the audio, Manicki and Gatza can be heard remarking that the state name on the license plate of the nearby car (Dunn's car) is obscured and debating which state's plates it most resembles. (*See id.* 0:30–1:50; *see also* DSOMF-A ¶ 12.) The officers turned on their emergency lights to pull Dunn over. (DSOMF-A ¶ 13.) Dunn told officers later that when they pulled him over, he had been up for three days straight playing cards and gambling. (*Id.* ¶ 14; *id.* Ex. 5, Arresting Officer Video at 6:01–6:10, Dkt. No. 162-5.)

Manicki and Gatza smelled burning cannabis when they approached Dunn's car window. (DSOMF-A ¶ 15.) They asked Dunn to get out of the car, but he refused. (*Id.* ¶ 16.) Manicki took

his K-9 police dog, named Alistair, out of their patrol car and walked him around Dunn's vehicle. (*Id.* ¶¶ 17, 20.) Alistair is trained to detect the smells of cannabis, heroin, cocaine, and methamphetamine. (*Id.* ¶ 19.) Sergeant Manicki saw that Alistair changed his behavior and became excited near the driver's side door, which, based on Alistair's training, Manicki took to mean that Alistair had smelled one or more illegal narcotics in Dunn's car. (*Id.* ¶¶ 20–21.)

Up until this point in the dashboard footage, the camera remained inside the patrol car and the officers' exchanges with Dunn by his car are not audible. (*See* Dash Cam 1.) Then, around thirty seconds after returning the K-9 Alistair to their patrol car, Sergeant Manicki can be heard over the patrol car's radio reporting that their male suspect was refusing to get out of his car. (*Id.* at 9:05–9:12.) A couple of minutes later, Manicki walked back to the patrol car, removed the camera from the dashboard, and brought it to the passenger window of Dunn's car. (*See id.* at 11:50–12:25.) At that point in the video, the officers' voices can be heard clearly, though Dunn's voice inside the car cannot.

Over the next twelve minutes, Manicki and Gatza repeatedly told Dunn to exit his vehicle and that he was under arrest for obstructing peace officers. (*Id.* at 12:25–24:50.) The officers also ordered Dunn on several occasions to lower his windows so that they could speak to him, but he did not. (*Id.* at 16:55–16:59, 17:48–17:51.) At one point, Sergeant Manicki called Defendant Buffo to the scene to bring "stop sticks," which would slow down or damage Dunn's car if he attempted to flee. (DSOMF-A ¶ 24.) It is not clear from the footage or from Defendants' statement of facts when exactly Buffo arrived, but around fifteen minutes after they first pulled over Dunn, Manicki warned him that they had placed stop sticks on his rear tires so he could not drive off. (*See* Dash Cam 1 at 18:01–18:10.) Four minutes later, Manicki advised Dunn that they were planning to break his window to get inside his car. (*Id.* at 22:09–22:30.) Manicki repeated

the warning one minute later. (*Id.* at 23:50–23:53.) Manicki then warned Dunn two times that he needed to cover his face because they were planning to break a window. (*Id.* at 24:27–24:31, 24:47–24:50.) Buffo broke through the rear window of Dunn's car on the passenger side. (*Id.* at 24:50–24:56; DSOMF-A ¶ 29.)

While Buffo was trying to unlock the back door of Dunn's car through the broken window, Dunn drove away. (DSOMF-A ¶ 30; Dash Cam 1 at 24:55–25:23.) Buffo's arm was still inside the vehicle, so Dunn injured Buffo by driving off. (DSOMF-A ¶ 30.) Buffo sought medical care later that day (February 2, 2016). (*See id.* Ex. 6, Dkt. No. 162-6.) Because of the stop sticks on his tires, Dunn was only able to drive between ten and thirty miles per hour. (DSOMF-A ¶ 31.) Over the next twenty-five minutes, officers followed Dunn with their sirens and lights on, but he did not pull over. (*Id.* ¶ 32; Dash Cam 1 at 25:23–32:44; DSOMF-A, Ex. 7, Dash Cam 2 at 0:00–17:45, Dkt. No. 162-7.)

County Defendant Deputy Kye Denault ("K. Denault")[2] was also in the area that night and had heard officers over the radio ask for assistance. (Defs. Denault and County's Statement of Material Facts ("DSOMF-B") ¶ 14, Dkt. No. 158.) As a result, K. Denault drove further east on Interstate 80, past the other officers' pursuit, and placed stop sticks on the road to stop Dunn. (*Id.* ¶ 15.) Dunn testified at his deposition that he stopped his car when he saw the obstruction (which he described as a "metal rope cord") that K. Denault had placed on the roadway. (DSOMF-A, Ex. 1, Dep. of Zsoch Dunn ("Dunn Dep.") 140:16–141:8, Dkt. No. 162-1.) Numerous officers approached Dunn's car and arrested him. (DSOMF-A ¶ 33.) K. Denault helped officers handcuff

---

[2] According to the County's statement of facts, there is another County Deputy named Bryan Denault ("B. Denault"). (*See* Defs. Denault and County's Statement of Material Facts ¶ 24, Dkt. No. 158.) B. Denault is not a named Defendant to this suit. B. Denault transported Dunn in his patrol car from the scene of the arrest to LaSalle County Jail, from the Jail to the Illinois Valley Community Hospital, and from the Hospital to the City police department, because his patrol car had an in-car audio and video recorder. (*Id.* ¶¶ 25–27.) B. Denault had no other involvement with Dunn. (*Id.* ¶¶ 24, 28.) The County informed Dunn during discovery that there were two officers named Denault involved in his case. (*Id.* ¶¶ 29–30.)

Dunn and moved Dunn from a City patrol car into a County patrol car equipped with a camera and audio recorder; but otherwise, K. Denault had no other contact with Dunn or involvement in his arrest. (DSOMF-B ¶¶ 18–23.)

While Dunn was handcuffed in the back of a patrol car, he removed his cell phone from his pocket, and Sergeant Manicki took it away from him. (DSOMF-A ¶ 36; *id.* Ex. 9, Dash Cam 3 at 0:00–0:20, Dkt. No. 162-9.) Dunn complained that his handcuffs were too tight, so Manicki checked one of the cuffs and was able to stick three fingers between the metal and Dunn's arm. (DSOMF-A ¶¶ 37–38; Dash Cam 3 at 0:20–0:56.) When officers searched Dunn's person, they discovered a large amount of money. (DSOMF-A ¶ 34.) Manicki searched Dunn's car and found a red "Jump Man" book bag—inside were two rolls of duct tape, a black ski mask, a black stocking hat, a firearm, men's body spray, five pieces of unopened mail, and a small plastic bag that appeared to contain cannabis. (DSOMF-A ¶ 39; *id.* Ex. 8, LaSalle Police Evid. List and Receipt ("Evid. Log"), Dkt. No. 162-8.) (A forensic laboratory later determined that the plastic bag which appeared to contain cannabis did, in fact, contain cannabis. (DSOMF-A ¶ 47.)) Manicki also found three cell phones in Dunn's car. (*Id.* ¶ 40.)

The dashboard camera footage concludes after showing several officers escort Dunn out of a patrol car in the County Sheriff's Department parking garage. (*See* Dash Cam 3 at 11:40–12:59.) Based on separate video taken at the Sheriff's Department, Gatza and Buffo were the only City officers who went to the Sheriff's Department that night, along with at least six County officers. (DSOMF-A ¶ 53; *see id.* Ex. 5, Arresting Officer Video, Dkt. No. 162-5 (showing County officers in tan uniforms).) Dunn told officers that they had hurt his shoulder during the arrest and that he wanted to go to the hospital immediately. (DSOMF-A ¶ 48; Arresting Officer Video at 4:08–4:40, 8:05–8:25.) One of the officers asked Dunn to stand so that they could take him to the hospital,

but Dunn said that he could not stand without his cane. (Arresting Officer Video at 12:21–12:45.) Gatza and Buffo helped Dunn up, guided him to the floor for several minutes to secure him, and then placed him in a wheelchair to take him to the hospital. (*Id.* at 13:40–16:11.) While officers were putting Dunn into the wheelchair, he demanded that they count his money in front of him before taking him to the hospital, and they did so. (*Id.* at 15:00–32:30.) Dunn's cash amounted to $16,626. (DSOMF-A ¶ 43; Evid. Log at 1, 3.) Then, while Dunn was still seated in the wheelchair, Buffo took off his shoes to confirm there were no items inside and placed them back on. (DSOMF-A ¶ 51.)

A County police officer took Dunn to Illinois Valley Community Hospital in Peru, Illinois at around 2:00 A.M. on February 2, 2016. (*Id.* ¶ 54; *id.* Ex. 15, Medical R. at 2, Dkt. No. 162-15; DSOMF-B ¶ 26.) A nurse named Annabelle Perez took Dunn's vitals and assessed his complaints. (DSOMF-A ¶ 56.) Dr. Kelton examined Dunn and took x-rays off his right shoulder where he had indicated he was feeling pain. (*Id.* ¶ 57; Medical R.; Dunn Dep. 244:10–247:11.) Dunn's medical records from Illinois Valley Community Hospital show that he was not physically injured. (DSOMF-A ¶ 58.) Specifically, the medical professionals wrote based on their examination that Dunn's shoulder appeared normal, with no signs of trauma (such as a dislocation or fracture). (*See* Medical R. at 3, 5.) Dr. Kelton suggested that Dunn take Tylenol to manage his pain. (*Id.* at 7.)

Officers returned Dunn's $16,626 to him a few weeks after his arrest, on February 26, 2016.[3] (Evid. Log at 1.) Dunn admitted in his deposition testimony that police gave him $16,626

---

[3] On the evidence log Defendants submitted, a handwritten note states that Dunn's money was returned on "02/26/2015." (*See* Evid. Log at 1.) That date is clearly an error because 2015 was the year before the events that gave rise to this case. (*See* Dunn Dep. 202:1–8 (acknowledging the error).) At Dunn's deposition, he acknowledged that officers asked him to sign the evidence log on February 26, 2016 to represent that they had returned his money (though Dunn did not admit to signing the log). (*See id.* at 204:12–16.) The Court will assume for purposes of its Opinion that the evidence log should reflect the return of Dunn's money on February 26, 2016.

in cash. (Dunn Dep. 205:19–24.) Sergeant Manicki, Officers Gatza and Buffo, and County Jail Superintendent Jason Edgcomb have all submitted affidavits confirming that they preserved and produced all the relevant video footage to Dunn and that the video is an accurate depiction of Dunn's arrest. (DSOMF-A ¶ 64; *id.* Ex. 20, Aff. of Mark A. Manicki ¶¶ 5–11, Dkt. No. 162-20; DSOMF-A, Ex. 10, Aff. of Raymond F. Gatza ¶¶ 5–9, Dkt. No. 162-10; DSOMF-A, Ex. 11, Aff. of Aaron J. Buffo ¶¶ 3–6, Dkt. No. 162-11; DSOMF-A, Ex. 21, Aff. of Jason Edgcomb ¶ 11, Dkt. No. 162-21.)

Several weeks after Dunn's arrest, on February 23, 2016, a grand jury in LaSalle County indicted Dunn on one count of aggravated battery and one count of aggravated fleeing and eluding. (DSOMF-A ¶ 62.) Dunn pleaded guilty to the charges on January 23, 2019. (*Id.* ¶ 63.)

Based on the above-described events, Dunn's amended complaint in this lawsuit asserts the following eight claims against Defendants:

- Count I is a § 1983 excessive force claim against Sergeant Manicki; Officers Gatza, Buffo, Margis, and Sines; Deputy K. Denault; and unknown officers (collectively, "Officer Defendants"). (Am. Compl. ¶¶ 1–24.) The excessive force claim alleges that Officer Defendants threatened to harm Dunn, broke his car window, injured him during his arrest, and attacked him at the County Sheriff's Department. (*Id.*)

- Count II is a § 1983 claim for false arrest against Officer Defendants, alleging that they arrested Dunn on false charges to cover up their own illegal acts. (*Id.* Count II, ¶¶ 25–29.[4])

- Count III of the amended complaint asserts a claim for wrongful deprivation of property against Officer Defendants, alleging that they returned approximately $16,000 of Dunn's cash to him but kept over $5,000, four cell phones, a blank flare gun, a "Michael Jordan" bag, and several of Dunn's personal documents. (*Id.* Count III, ¶¶ 25–30.)

---

[4] Counts II–VIII of Dunn's amended complaint all begin with the paragraph number 25. The Court will specify to which paragraphs it refers to by including the relevant Count in all its citations to the amended complaint. (*See, e.g.*, Am. Compl. Count II, ¶¶ 25–29.)

- Count IV alleges that Gatza, K. Denault, and Dr. Kelton failed to provide Dunn medical attention. (*Id.* Count IV, ¶¶ 25–34.) Specifically, Dunn claims that Gatza and K. Denault took Dunn to Illinois Valley Hospital and told doctors that they had just arrested Dunn, encouraging doctors not to give Dunn medical attention. (*Id.*)

- Count V brings a claim for "spoliation of evidence" against Officer Defendants, alleging that they withheld additional video evidence even after Dunn sent them a letter requesting the evidence. (*Id.* Count V, ¶¶ 25–31.)

- Count VI alleges that Gatza, K. Denault, and Kelton conspired to deprive Dunn of proper medical care. (*Id.* Count VI, ¶¶ 25–38.)

- Count VII is a common-law false imprisonment claim against Officer Defendants. (*Id.* Count VII, ¶ 25.)

- Count VIII is a statutory indemnification claim against the City and County. (*Id.* Count VIII, ¶¶ 25–27.)

Defendants have moved for summary judgment as to all of Dunn's claims.

## DISCUSSION

A party is entitled to summary judgment if it can show that there is no genuine dispute as to any material fact and thus, it is entitled to judgment in its favor as a matter of law. *Hummel*, 817 F.3d at 1015. The movant has the burden of either: (1) showing that there is no evidence to support an essential element of the nonmoving party's claim; or (2) presenting affirmative evidence that negates an essential element of the nonmoving party's claim. *Id.* at 1016. To oppose summary judgment successfully, the nonmovant must produce evidence and cannot merely rely on his pleadings. *Id.* Thus, as explained above, Dunn's failure to contest Defendants' assertions of undisputed facts results in the admission of those facts for purposes of summary judgment (to the extent that they are supported by the record). *Raymond*, 442 F.3d at 608. Nonetheless, the Court must review the record with a critical eye to determine whether it demonstrates that Defendants are entitled to judgment as a matter of law. *Nabozny v. Podlesny*, 92 F.3d 446, 457 n.9 (7th Cir. 1996); *White v. United Credit Union*, 111 F. Supp. 3d 878, 881–82 (N.D. Ill. 2015).

## I.     Excessive Force (Count I)

Count I of Dunn's amended complaint alleges that Officer Defendants violated his constitutional rights by using excessive force against him during and after his arrest. The Fourth Amendment prohibits police officers from using "greater force than is reasonably necessary to make the arrest." *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013) (alterations and citations omitted). An excessive force claim is evaluated under the Fourth Amendment's objective-reasonableness standard, which requires balancing the individual's rights against the government's interest in protecting the public. *Id.* The relevant factors in evaluating officers' reasonableness include the severity of the crime, whether the arrestee posed an immediate threat to officers' or the public's safety, and whether he actively resisted arrest or tried to flee. *Id.* The factfinder may also consider the types of injuries the plaintiff suffered. *See McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). But ultimately, questions of reasonableness and excessive force are "analyzed from the perspective of a reasonable officer under the circumstances, rather than examining the officer's actions in hindsight." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). While those questions are often appropriate for the jury, the Court must resolve the issue as a matter of law if there are sufficient undisputed material facts showing that the officer acted reasonably under the circumstances. *Id.*

Here, the Court finds no evidence that could support a finding that excessive force was used towards Dunn, either during his arrest or at the Sheriff's Department. Officer Defendants acted reasonably in breaking Dunn's window after ordering him unsuccessfully for twenty minutes to lower his window to speak to them. They warned Dunn several times that they would break a window if he did not comply. Sergeant Manicki warned Dunn several times to cover his face because there would be broken glass. Finally, the officers selected the rear passenger's side

window (the farthest from Dunn) to prevent any injury and the evidence does not show any injury. Officers then used reasonable force to remove Dunn from his car—after he had injured an officer and led them on a low-speed chase for twenty-five minutes.

A certain amount of force to effect an arrest is expected. *See Graham*, 490 U.S. at 396 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." (internal citation omitted)). But here, there is no evidence that officers used violence or even more than a minimal amount of force to arrest Dunn. Dunn's claim that his handcuffs were too tight could constitute a use of excessive force under certain circumstances. *See Hardrick v. City of Bolingbrook*, 522 F.3d 758, 763–64 (7th Cir. 2008) (reversing summary judgment where the evidence showed that officers broke the plaintiff's wrists while handcuffing him). But Dunn's allegation is belied by the evidence that Manicki checked Dunn's cuffs on the scene and found that he could fit three fingers between the metal and Dunn's wrist, as well as by the fact that while Dunn was cuffed in the back seat of a patrol car, he was able to get his cell phone out of his pocket.

Finally, there is no evidence that Officer Defendants used excessive force against Dunn at the County Sheriff's Department later in the night before taking him to the hospital. The video footage does show that when Dunn said he could not stand up on his own without a cane, officers forced him onto the floor to secure him before placing him in a wheelchair. Placing a suspect onto the floor for a few minutes is not, by itself, evidence of excessive force, however. *See Padula*, 656 F.3d at 604; *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir.1997) ("Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest."). While not dispositive, the medical evidence also undermines Dunn's claims of excessive force. *See McAllister*, 615 F.3d at 881 (finding that the plaintiff's injuries may be

relevant in determining whether a use of force was reasonable). Officers took Dunn to the hospital at his request shortly after he claimed they beat him up, and the examining doctors found no evidence of recent trauma or injury. In conjunction with the other evidence Defendants submitted, Dunn's medical records from that night lend further support to Defendants' presentation of the facts and weaken Dunn's claims.

In conclusion, there is no evidence in the record that could support Dunn's claim of excessive force. Summary judgment is granted as to Count I.

## II.    False Arrest and False Imprisonment (Counts II and VII)

Dunn has asserted claims for both false arrest and common-law false imprisonment against Officer Defendants. "To prevail on a false-arrest claim under § 1983, a plaintiff must show that there was no probable cause for his arrest." *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016). Similarly, to establish a false imprisonment claim under Illinois common law, the plaintiff must show that the defendants restrained or arrested him without reasonable grounds to believe that he committed a crime. *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 317 (Ill. App. Ct. 2006). Counts II and VII of the amended complaint both depend on the same element—unreasonable restraint without probable cause. *Id.* "The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment." *Abbott*, 705 F.3d at 713–14. Because the federal and state-law false arrest and false imprisonment claims depend upon a finding that there was no probable cause to detain or arrest him, the Court discusses the claims together.

First, Defendants argue that Dunn's false arrest and false imprisonment claims are entirely barred by the guilty plea in his underlying criminal case. It is well-established that a § 1983 case cannot proceed if a judgment in the plaintiff's favor would imply that his related criminal

conviction was invalid. *See Heck v. Humphrey*, 512 U.S. 477 (1994). But *Heck* does not bar all § 1983 false arrest cases. A plaintiff may still obtain relief for an illegal search, seizure, or arrest, as long as his claim does not create any inconsistencies with his later conviction. *See Rollins v. Willett*. 770 F.3d 575, 576–77 (7th Cir. 2014) (judgment in the defendants' favor reversed where the plaintiff's § 1983 illegal seizure case would not impact the validity of his guilty plea). The Court lacks sufficient information concerning Dunn's underlying plea to determine whether *Heck* bars his claim that officers lacked probable cause for his arrest. But the Court need not decide the issue because the undisputed facts could not support a finding in Dunn's favor in any case.

Probable cause exists if at the time of the arrest, an officer had sufficient knowledge to warrant a reasonable, prudent person to believe that the arrestee "had committed, was committing, or was about to commit a crime." *Abbott*, 705 F.3d at 714 (citations omitted). "Probable cause is a fluid concept based on commonsense interpretations of reasonable police officers as to the totality of the circumstances known at the time the event occurred." *United States v. Ellis*, 499 F.3d 686, 689 (7th Cir. 2007) (citations and internal quotation marks omitted).

The Court here considers Officer Defendants' probable cause at all relevant points of their interactions with Dunn on February 1 and February 2, 2016. Sergeant Manicki and Officer Gatza first pulled Dunn over because they noticed that the state name on his license plate was not visible. "Whenever police stop a car, the stop must satisfy the Fourth Amendment's reasonableness requirement." *United States v. Simon*, 937 F.3d 820, 828 (7th Cir. 2019) (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). A simple traffic stop is supported by probable cause if based on the circumstances, officers reasonably believe that the driver committed even a minor traffic offense. *Id.* at 828–29 (citations omitted). While the Court cannot endorse Defendants' suggestion that it was reasonable to stop Dunn because he was driving nine miles

under the speed limit, Manicki and Gatza did have probable cause to pull Dunn over for obscuring the state on his license plate. Illinois law requires drivers to ensure that their license plates are visible. *See* 625 ILCS 5/3-413(b); *see also Jenkins v. Spaargaren*, No. 09 C 3453, 2011 WL 1356757, at *5 (N.D. Ill. Apr. 7, 2011) (granting defendants' motion for summary judgment as to false arrest and malicious prosecution claims, finding that officers had probable cause under Illinois law to pull the plaintiff over where the undisputed facts showed that part of his license plate was covered). Thus, Manicki and Gatza acted reasonably in pulling Dunn over when they noticed that a portion of his license plate was obscured. (*See* Dunn Dep., Ex. 3, Dkt. No. 162-1 (showing in a photograph of the relevant car that the state at the top of the license plate is not visible).)

Manicki and Gatza detained Dunn for further questioning and a K-9 drug search after they smelled burning marijuana coming from his car. Under Seventh Circuit precedent, they had probable cause to arrest him at that point for possession of an illegal substance.[5] *See United States v. Paige*, 870 F.3d 693, 700 (7th Cir. 2017) (finding that the odor of marijuana coming from a specific person provides sufficient probable cause to arrest that person for marijuana possession). Several minutes later, officers told Dunn that he was under arrest for obstructing a peace officer. Under Illinois law, "a person commits obstruction or resistance of a peace officer when, (1) knowing that one is a peace officer, (2) he or she knowingly resists or obstructs (3) the officer's performance of an authorized act." *Abbott*, 705 F.3d at 721 (citing 720 ILCS 5/31-1(a)). In order to actually resist or obstruct, a person must perform some physical act that hinders, interrupts, or delays the officer's duties, such as going limp. *Id.* (quoting *People v. Raby*, 240 N.E.2d 595, 599 (Ill. 1968)). Here, Manicki and Gatza pulled Dunn over in their patrol car while wearing their

---

[5] The possession of a small amount of marijuana became legal under Illinois law on June 25, 2019, three years after the relevant events of this case. *See* Cannabis Regulation and Tax Act, 410 ILCS 705/1-1 *et seq.*

uniforms, establishing the first element of an obstruction offense (that he knew they were police officers). Dunn refused to open his door or even lower his window to talk to them about his potential traffic violation. Under Illinois law, those facts are sufficient to show that Dunn committed obstruction. *See People v. Synnott*, 811 N.E.2d 236, 240–41 (Ill. App. Ct. 2004) (sustaining a defendant's criminal conviction for obstructing a peace officer based on the evidence that he had repeatedly refused officers' orders to exit his vehicle after a lawful traffic stop).

In addition to Dunn's obstruction, by the time officers were actually able to handcuff him, they had also seen him resist arrest—and commit a basic battery—by driving his car away while an officer's hand was inside. In sum, the undisputed facts cannot support Dunn's assertion that Officer Defendants lacked probable cause to detain and arrest him. Summary judgment is therefore granted in Defendants' favor with respect to Counts II and VII.

### III.    Wrongful Seizure and Deprivation of Property (Count III)

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated" without probable cause. U.S. Const. amend. IV. For constitutional purposes, a "seizure" means a meaningful interference with an individual's possession of his property. *Lee v. City of Chicago*, 330 F.3d 456, 460 (7th Cir. 2003) (citing *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)). Officer Defendants here unquestionably seized Dunn's money and other personal items when they arrested him. Police are entitled to search and inventory an individual's property when they take him back to the stationhouse after an arrest. *Illinois v. Lafayette*, 462 U.S. 640, 643–48 (1983). Nonetheless, "[i]t is axiomatic that property once seized, but no longer needed, should at some point be returned to its rightful owner." *Lee*, 330 F.3d at 466.

Officer Defendants submitted evidence showing that they returned Dunn's $16,626 to him several weeks after his arrest. Dunn has admitted that police returned the $16,626 (*see* Dunn Dep. 205:19–24) and has not presented any evidence that he had more money or other items on February 2 that officers failed to return.[6] A party opposing summary judgment must respond "by offering evidence that would allow a reasonable trier of fact to find in that party's favor on the issue." *Hummel*, 817 F.3d at 1016. To state it more bluntly, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation and quotation marks omitted). Dunn has not offered any evidence that could support a finding that police unlawfully kept any of his cash or other items. Defendants are therefore entitled to summary judgment on Count III, the wrongful deprivation of property claim.

## IV. Failure to Provide Medical Attention and Conspiracy to Deprive of Medical Care (Counts IV and VI)

To succeed on a claim for failure to provide medical attention, a pretrial detainee must show that state officials acted objectively unreasonably and with reckless indifference to his serious medical needs. *Miranda v. County of Lake*, 900 F.3d 335, 352–54 (7th Cir. 2018). To succeed on any conspiracy claim alleging that defendants conspired to violate a constitutional right, a plaintiff must prove the underlying constitutional violation and prove that defendants reached an agreement and committed overt acts to carry out the violation. *Daugherty v. Page*, 906

---

[6] Based on Dunn's deposition testimony, he has not even been able to provide a consistent estimate of the amount of cash that Defendants allegedly stole from him. At one point he estimated that officers took "in excess of 4000 or 5000." (Dunn Dep. 206:20–21.) When asked how much money he had on his person that night, he said, "I can prove I had 15 grand from a royal flush, 33,000-plus from a car accident, and another 30-something thousand from another accident . . ." (*Id.* at 207:3–10.) During the deposition, Dunn presented as proof of his royal flush winnings what he described as a "ticket coupon from the royal flush that night." (*Id.* at 208:2–3.) Counsel at the deposition described the item on the record as a photograph of a placard that read "Chimonee's Food Court 088." (*Id.* at 208:7–10.)

F.3d 606, 612 (7th Cir. 2018). Because Dunn's conspiracy claim depends on his claim for failure to provide medical attention, the Court discusses Counts IV and VI together.

Defendants have presented undisputed evidence that officers took Dunn to the hospital the same night of his arrest. Dunn's medical records show that he arrived at the hospital at around 2:00 A.M., whereas Manicki and Gatza pulled him over at around midnight. In assessing a § 1983 claim for failure to provide medical care based on delayed care, "whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). To succeed on a claim based on delay, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Id.* at 730–31. In this case, doctors at Illinois Valley Community Hospital examined Dunn's right shoulder on the night of his arrest and found no signs of injury or recent trauma. Dunn has not presented any evidence disputing that or suggesting that he had another injury that Defendants ignored. Furthermore, the video from the County Sheriff's Department shows that officers offered to take Dunn to the hospital sooner, but he insisted that they count his money first.

Because there is no evidence from which a reasonable jury could conclude that Defendants acted with reckless disregard to Dunn's serious medical needs or that the delay in obtaining treatment harmed him, Defendants are entitled to summary judgment on both Counts IV and VI.

### V.     Spoliation (Count V)

Dunn has brought a "spoliation" claim against Officer Defendants, alleging that they withheld or destroyed relevant evidence. Spoliation is not an independent tort under Illinois law, but it may be treated as a type of negligence. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509–10 (7th Cir. 2007) (citing *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270 (Ill. 1995)).

To prevail on a negligence claim predicated on the alleged destruction of evidence, a plaintiff must show that defendants had a duty to protect certain documents or evidence, that defendants breached that duty, that the breach proximately caused an injury, and that the injury resulted in damages. *Id.* (citation omitted). "Whether Illinois courts will recognize a cause of action for willful and wanton or intentional spoliation of evidence remains an open question." *Rogers v. McConnaughay*, 2018 IL App (3d) 170690-U ¶ 41 (Ill. App. Ct. 2018) (internal quotation marks omitted). But if such a tort existed under Illinois law, a plaintiff would need to "prove that the defendants intentionally destroyed or misplaced the evidence." *Id.*

Defendants' alleged spoliation of evidence continues to be a primary focus of Dunn's filings. However, he has not presented any proof that evidence that previously existed is now missing or that Defendants destroyed or failed to produce evidence. Of course, destruction of evidence may be inherently difficult to prove. But some offer of proof is still required to establish a spoliation claim (and to warrant Rule 37 sanctions, which Dunn has requested several times). *Martin v. Kelley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012); *see also United States v. McGaughey*, 977 F.2d 1067, 1071 (7th Cir. 1992) (explaining that loss or destruction of evidence is most often proven circumstantially, for instance, by showing that a diligent search and inquiry for the relevant file was unsuccessful (citations omitted)).

Defendants are entitled to summary judgment on Dunn's "spoliation" claim. Defendants submitted several affidavits swearing that they preserved and provided all relevant evidence to Dunn (including all relevant video footage). Dunn has not presented any proof, direct or circumstantial, that any documents or footage are missing from which a reasonable jury could conclude that Defendants destroyed evidence. Summary judgment is therefore granted in Defendants' favor as to Count V.

## VI.     Statutory Indemnification (Count VIII)

Dunn's final claim for statutory indemnification alleges that the City and County are liable under 745 ILCS 10/9-102 for the unlawful acts of their employees. Because the Court has granted summary judgment on all of Dunn's claims against the individual Defendants, the City and County are entitled to summary judgment, as well.

## CONCLUSION

For reasons explained above, Defendants' motions for summary judgment (Dkt. Nos. 155, 160) are granted in their entirety. For the sake of clarification, the Court dismisses with prejudice Counts IV and VI against Defendant Kelton pursuant to Federal Rule of Civil Procedure 12(b)(6). The Clerk is directed to enter judgment in favor of Defendants. Dunn is advised that this ruling represents a final decision with respect to the pending action. If he wishes to appeal, he must file a notice of appeal in this Court within 30 days of the entry of judgment. See Fed. R. App. P. 4(a)(1). He need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within twenty-eight days of the entry of judgment, see Fed. R. Civ. P. 59(e), and suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. See Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. See Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if filed within twenty-eight days of the entry of judgment. See Fed. R. App. P. 4(a)(4)(A)(vi). Neither the time to file a Rule 59(e) motion nor the time to file a Rule 60(b) motion can be extended. See Fed. R. Civ. P. 6(b)(2).

ENTERED:

Dated:  March 31, 2021

Andrea R. Wood
United States District Judge